J-A16016-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| IN THE INTEREST OF: M.L.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.J., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 223 WDA 2024 |

Appeal from the Order Dated January 18, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000155-2023

| IN THE INTEREST OF: R.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.J., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 224 WDA 2024 |

Appeal from the Order Entered January 18, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000154-2023

BEFORE: KUNSELMAN, J., MURRAY, J., and McLAUGHLIN, J.

MEMORANDUM BY MURRAY, J.: **FILED: JULY 22, 2024**

R.J. (Mother) appeals from the orders granting the petitions of the Allegheny County Office of Children, Youth, and Families (the Agency or OCYF), and involuntarily terminating Mother's parental rights to M.L.G. (a son

born in April 2021), and R.R. (a daughter born in September 2012) (collectively, the Children).[1]  Upon careful review, we affirm.

The orphans' court explained the events that brought the family to OCYF's attention, and detailed the ensuing dependency proceedings:

> R.R. was born [in] September [] 2012, and it appears that the family did not have any involvement with OCYF until 2015. The basis for that involvement was a fire in the family home that killed R.R.'s [minor] sister.  N.T., 11/29/23, at 10.  That case closed after OCYF was able to help the family secure housing. Sometime later, Mother became involved with [M.L.G.'s putative father, M.G].  [M.G.] was known to the [A]gency because they had been involved with [M.G.'s] other children.  *Id.* at 12.  In 2020, Mother became pregnant[,] and M.[L.]G. was born [i]n April [] 2021.  At the hospital, M.[L.]G. was subjected to routine testing[,] which included [umbilical] cord blood.  The results of that test were provided to OCYF[,] which prompted them to begin an investigation into the family.[2]  *Id.*
>
> An OCYF caseworker appeared at the family home on April 13th, 2021[,] to speak with the parents.  She observed several men in the home[,] including one passed out on the couch. Mother appeared lethargic and refused to submit to a drug screen. *Id.*  The caseworker also observed [M.L.G.] to be sleeping on top of a bed covered in blankets.  [M.G.] reported that M.[L.]G. had been sleeping with the parents.  *Id.*  Both Mother and [M.G.] appeared to be under the influence of drugs.  Due to numerous safety concerns, OCYF sought an emergency custody authorization that day.  When OCYF returned with the police, Mother refused to allow them in.  In an effort to prevent the police from entering the home, Mother threatened to put [M.L.G.]

_____

[1] The orphans' court also involuntarily terminated the rights of the unknown fathers of the Children, and M.G., the putative father of M.L.G.  Neither the unknown fathers nor M.G. are parties to the instant appeal.

[2] OCYF casework supervisor Katelyn Miller (Miller) testified that Mother "admitted to using THC, but she denied using cocaine and stated that she didn't know how M[.L.G.]'s cord blood could contain cocaine."  N.T., 11/29/23, at 13.

against the door. *Id.* at 13. Police and OCYF caseworkers eventually entered the home and were able to remove the [C]hildren. The [C]hildren were placed with a [putative paternal] relative[, Jasmire G].

Dependency petitions were filed for both [C]hildren on April 16th, 2021. Joint Exhibit 1.[3] The [C]hildren were adjudicated [dependent] on May 11th, 2021. The [dependency] court ordered the [C]hildren to remain in their placement with Jasmire G[]. Mother was ordered to engage in the appropriate level of drug and alcohol treatment, comply with random [drug and alcohol] screens, participate in an Intimate Partner Violence (hereinafter "IPV") assessment and to comply with any recommendations. OCYF Exhibits 1 and 2.[4]

Orphans' Court Opinion, 3/14/24, at 2-3 (some record citations modified; footnotes and some paragraph breaks added).

The orphans' court held permanency review hearings in August, October, and November of 2021; May and September of 2022; and February, May, and August of 2023. The court competently recounted its dependency findings in its Pa.R.A.P. 1925 opinion. *See* Orphans' Court Opinion, 11/29/23, at 3-5. In summary, Mother was largely noncompliant in meeting the goals set for her by OCYF and the orphans' court. *See* N.T., 11/29/23, at 55, Exhibits 1 and 2.

On June 29, 2023, OCYF filed petitions to involuntarily terminate Mother's parental rights (TPR petitions) to each of the Children, pursuant to

---

[3] Joint Exhibit 1 consisted of 18 stipulations agreed upon by the parties.

[4] The Agency's Exhibits 1 and 2 consisted of court orders issued in the dependency cases of M.L.G. and R.R., respectively. No party objected to their admission into evidence. N.T., 11/29/23, at 55.

23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[5]  The Agency claimed Mother was "unable to parent the [Children,] as she has failed to comply with the goals established for her in Family Plans and ordered by [the orphans' c]ourt." TPR Petition (M.L.G.), 6/29/23, ¶ 9; TPR Petition (R.R.), 6/29/23, ¶ 9.

The orphans' court held an evidentiary hearing on the TPR petitions on November 29, 2023.  Mother did not attend the hearing, but her counsel was present.  The Children were not present, but each child's separate, legal counsel appeared on their behalf.[6]  Prior to the taking of testimony, the

_____

[5] The Children had been out of Mother's custody for over two years at the time OCYF filed the TPR petitions.

[6] The lower court appointed KidsVoice as guardian *ad litem* (GAL) for the Children at their dependency dockets.  Although the orders do not name a specific attorney from KidsVoice, Tara Yontz, Esquire, acted as GAL for both Children at many of the permanency review hearings.  Attorney Yontz was not present at the TPR hearing, and the orphans' court did not appoint a separate GAL at the instant docket.

Counsel for R.R. advised the orphans' court that while R.R. was initially conflicted regarding termination of Mother's parental rights, "she does maintain that she wants to be adopted."  N.T., 11/29/23, at 4; *see In re Adoption of K.M.G.*, 240 A.3d 1218, 1236 (Pa. 2020) ("[T]he attorney's view of the child's best interests and the child's preferred outcome likely lie … between strongly favoring termination and strongly disfavoring termination. It is not for an appellate court to determine how closely the interest must align or overlap to negate the existence of a conflict.").

Counsel for M.L.G. advised the orphans' court that M.L.G. "is currently two years old[,] and while he is certainly becoming more verbal, he is not able to understand … his legal position, and therefore there is no divergence between his legal and best interest."  N.T., 11/29/23, at 72-73.  Under these facts, remand for participation of the GAL at the termination hearing is not necessary.

orphans' court permitted R.R.'s counsel to state R.R.'s position on the record. N.T., 11/29/23, at 3. Counsel explained that while R.R. had initially desired to be returned to Mother's care, R.R.'s position changed, and she wished to be adopted by her foster family.[7] *Id.* at 5.

Following R.R.'s counsel's statement, the Agency called OCYF casework supervisor Miller to testify as its only witness. Ms. Miller testified the primary goals for Mother were to "address her substance use, … ongoing mental health concerns, … the history of intimate partner violence, and … visitation with her minor children and parenting programs." *Id.* at 15. Although Mother agreed to start outpatient drug and alcohol treatment in May 2021, "[s]he never signed the releases [or] provided any verification of treatment." *Id.* at 16.

Concerning Mother's substance abuse, Ms. Miller continued: In February 2022, Mother and M.G. appeared intoxicated during a home assessment. *Id.* at 18-19. During an April 2022 home visit, an OCYF casework aide observed that Mother was intoxicated and "had minimal interactions with the [Children]." *Id.* at 19. At a December 22, 2022, permanency hearing, "both parents visibly appeared intoxicated[,] and their behaviors were completely erratic in the courtroom." *Id.* After recently having her fourth child, Mother admitted to Ms. Miller that she used "Percocet every other day[,] up to three times a day[,]" and that she had done so throughout her pregnancy. *Id.* at

---

[7] The Children are placed with the same pre-adoptive foster family.

21. The Agency requested 123 drug screens, only four of which Mother attended. *Id.* On one of these four occasions, Mother refused to provide a urine sample. *Id.* At no time did Mother provide proof of participation in (or completion of) a drug and alcohol treatment program. *Id.* at 22.

Ms. Miller testified the Agency was concerned about Mother's mental health "due to consistent erratic behaviors that she has had towards the [A]gency and in general during visits[.]" *Id.* Mother did not progress toward her court-ordered mental health goal, and did not provide evidence of obtaining mental health treatment. *Id.* at 23; *see also* Permanency Review Order, 2/21/23, at 1 ("Mother is not engaged in [mental health] or [drug and alcohol] treatment.").

Concerning visitation, Ms. Miller testified Mother failed to meet her visitation goal. *Id.* at 28. Mother was initially permitted supervised visits arranged informally with the Children's caregivers. *Id.* at 24. However, because Mother did not have reliable transportation, the Agency coordinated transportation to an OCYF office for visitations. *Id.* Despite this accommodation, Mother failed to maintain consistent visitations, which resulted in the orphans' court decreasing visits to twice a month on June 13, 2023. *Id.* at 28; *see also* Order, 6/13/23, at 1. To the Agency's knowledge, Mother had not been involved in the Children's medical, dental, educational, or therapeutic appointments or services for the six months preceding the filing

of the TPR petitions. *Id.* at 28, 36. Mother had not visited the Children since May 9, 2023. *Id.* at 52.

On January 18, 2024, the orphans' court entered its orders terminating Mother's parental rights to the Children, pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Mother filed timely notices of appeal and contemporaneous Pa.R.A.P. 1925(a)(2)(i) concise statements at each docket number. On March 14, 2024, the orphans' court issued identical Pa.R.A.P. 1925 opinions at each docket number.[8]

Mother presents the following issues:

> 1. Did the [orphans'] court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S.[A.] §[]2511(a)(1), (2), (5), and (8)?
>
> 2. Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that [O]CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the children pursuant to 23 Pa.C.S.[A.] §[]2511(b)?

Mother's Brief at 8.

We review the termination of parental rights for an abuse of discretion. *See In the Int. of K.T.*, 296 A.3d 1085, 1104 (Pa. 2023). This standard of review requires appellate courts to

> accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the

---

[8] On March 13, 2024, this Court *sua sponte* consolidated Mother's appeals.

trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As [the Pennsylvania Supreme Court] discussed in [*In re:*] *R.J.T.*, [9 A.3d 1179, 1190 (Pa. 2010)], there are clear reasons for applying an abuse of discretion standard of review…. [U]nlike trial courts, appellate courts are not equipped to make fact-specific determinations on a cold record, where trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 74 A.3d 817, 826-27 (Pa. 2012) (some citations omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [Section] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [Section] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

- 8 -

*Matter of Adoption of L.C.J.W.*, 311 A.3d 41, 48 (Pa. Super. 2024) (citation omitted). "The standard of 'clear and convincing' evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re Adoption of C.L.G.*, 956 A.2d 999, 1004 (Pa. Super. 2008) (*en banc*) (citation omitted). Finally, this Court need only agree with the orphans' court as to "any one subsection of [Section] 2511(a), in addition to [Section] 2511(b), in order to affirm the termination of parental rights." *Int. of M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022) (citation omitted).

Instantly, we examine Mother's challenge pursuant to Section 2511(a)(1), which provides:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S.A. § 2511(a)(1).

To satisfy Section 2511(a)(1), the petitioner "must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *See In re Adoption of B.G.S.*, 245 A.3d 700, 706-07 (Pa. Super.

2021) (citation omitted); *see also In re Adoption of Charles E.D.M.*, 708 A.2d 88, 91 (Pa. 1998) ("Section 2511[(a)(1)] does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child *and* refusal or failure to perform parental duties." (citation omitted; emphasis in original)).

We have explained that in applying Section 2511(a)(1),

> [t]he court should consider the entire background of the case and not simply … mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of h[er] parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re Adoption of A.C.*, 162 A.3d 1123, 1129 (Pa. Super. 2017) (citations and paragraph break omitted). However, the General Assembly's emphasis on the six months immediately preceding the filing of the petition indicates the timeframe is the "most critical period for evaluation" of a parent's conduct. *In re Adoption of L.A.K.*, 265 A.3d 580, 592 (Pa. 2021).

Regarding the definition of "parental duties," our Supreme Court has explained:

> Our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert [herself] to take and maintain a place of importance in a child's life. Fortitude is required, as **a parent must act with "reasonable firmness" to overcome obstacles that stand in the way of preserving a parent-child relationship and may**

- 10 -

**not wait for a more suitable time to perform parental responsibilities**.

*Id.* (citations, some quotation marks, and brackets omitted; emphasis added).

Here, Mother asserts OCYF failed to establish "that Mother evidenced a settled purpose of relinquishing her parental claim to [the Children] or failed to perform her parental duties under [Section] 2511(a)(1)[.]" Mother's Brief at 17. Mother maintains she demonstrated her ability to care for the Children "through her positive visitation and interactions with" the Children. *Id.*

Contrary to Mother's assertions, the orphans' court determined Mother's conduct during the Children's placement evidenced her refusal to perform parental duties. *See* Orphans' Court Opinion, 3/14/24, at 11 ("Mother has continued to prioritize her drug use over her [C]hildren."). The orphans' court elaborated:

> Substance abuse has been the greatest concern throughout the history of the case. OCYF became involved because Mother admitted to using opiate pain medication every day during her pregnancy with M.[L.]G. N.T., 11/29/23, at 21. She underwent a drug and alcohol evaluation at the POWER [(Pennsylvania Organization for Women in Recovery)] Program on April 26th, 2021[,] and was recommended for treatment. Mother agreed to begin treatment[,] but never did. *Id.* at 19. She underwent a second POWER evaluation on January 25th, 2022. Treatment was recommended and Mother again agreed to comply with these recommendations. *Id.* at 20. Mother failed to provide documentation that she has successfully completed any type of drug and alcohol treatment. There were instances in February, April and December of 2022 where Mother appeared visibly intoxicated either at a court hearing or a visit. *Id.* at 18-20. Mother has appeared for [four] out of one hundred and twenty-three screens. *Id.* at 21. Mother's substance abuse has continued

- 11 -

to be of concern as her fourth child, who was born on November 21st, 2023, tested positive for opiates. ***Id.*** Mother reported to OCYF that she also used opiate pain medication regularly during her most recent pregnancy. ***Id.*** **Mother has made absolutely no progress on her goal of addressing her substance abuse issues**.

There were also concerns for Mother's unaddressed mental health issues. Mother's past trauma coupled with her erratic behavior was the basis for the mental health goal. Despite being offered numerous resources to accomplish this goal, Mother has never attended mental health treatment. For these reasons, the court found that Mother had not successfully completed this goal.

….

… Mother has never been consistent with visitation. Even when she was permitted to have supervised, liberal visitation at a family member's home, Mother did not consistently attend. ***Id.*** at 24. Visits were eventually moved to an OCYF office to accommodate Mother. **She has gone significant periods without seeing the** [**C**]**hildren. On June 13th, 2023, the court decreased Mother's visits to twice a month due to her lack of attendance at visitation**. ***Id.*** at 28. At the time of termination proceedings, Mother had not visited the [C]hildren for several months. ***Id.*** at 52. For these reasons, the court found that Mother had not successfully completed her goal of consistently visiting the [C]hildren.

**Mother has refused to perform her parental duties, and her conduct has caused the** [**C**]**hildren to be without the proper parental care necessary for their physical and mental well-being**. The causes of that refusal cannot be remedied within a reasonable period of time and the conditions which brought the [C]hildren in to care continue to exist.

Orphans' Court Opinion, 3/14/24, at 9-10 (citations modified; emphasis added).

Our review confirms the orphans' court's findings are supported by the record, and free of legal error. The record reflects Mother's visitation has been

- 12 -

sporadic for the last two years, and her contact with the Children continued to be minimal during the six months preceding the filing of the TPR petitions. *See* N.T., 11/29/23, at 24, 28, 52. Further, Mother's failure to perform parental duties resulted in the orphans' court appointing the Children's foster parents as educational and medical decision makers. *See id.* at 7, 29. Thus, we discern no error in the orphans' court's determination that OCYF proved, by clear and convincing evidence, that termination of Mother's parental rights was warranted under Section 2511(a)(1). *See S.P.*, 47 A.3d at 827 ("an appellate court must … defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion."). Mother's challenge to termination of her parental rights of the Children, under Section 2511(a), is without merit.

In her second issue, Mother challenges termination under 23 Pa.C.S.A. § 2511(b). When the orphans' court finds grounds for termination under Section 2511(a), it must separately consider a child's needs and welfare:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. ….

23 Pa.C.S.A. § 2511(b).

- 13 -

"Notably, courts should consider the matter from the child's perspective, placing [their] developmental, physical, and emotional needs and welfare above concerns for the parent." **K.T.**, 296 A.3d at 1105. Courts must also "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." **Id.** (citation omitted). However, "the parental bond is but one part of the overall subsection (b) analysis." **Id.** at 1113.

> The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care …; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability.

**Id.** (footnote and citations omitted).

> Mother argues:

> It was an abuse of discretion and/or error of law that supported the [orphans'] court's finding under [Section] 2511(a). Therefore, the [orphans'] court committed an error of law in proceeding to the analysis under [Section] 2511(b) and concluding that termination best meets the needs and welfare of the [C]hild[ren].

Mother's Brief at 20. Mother further asserts:

> Mother loves [the Children] and has much to offer for their benefit. The relationship between Mother and [the Children] adds value to their lives. Termination would unnecessarily and permanently deprive [the Children] of their relationship with Mother, and it is not best for their needs and welfare. [The Children] deserve[] to have their relationship with Mother preserved, which can only be assured if Mother retains her parental rights.

**Id.** at 21.

In her brief, Mother only challenges the orphans' court's conclusion that termination was warranted under Section 2511(a), and that it was error for the court to conduct an analysis under Section 2511(b). *Id.* at 20-21. Mother cites to no supporting legal authority. *See* Pa.R.A.P. 2119(a) (providing appellant's argument shall include "discussion and citation of authorities as are deemed pertinent."); *see also V.I.-P. v. S.R.D.*, 288 A.3d 502, 523 (Pa. Super. 2023) ("[T]his Court will not act as counsel and will not develop arguments on behalf of appellant." (citation omitted)). Moreover, her argument is belied by the record.

At the TPR hearing, Ms. Miller testified to her observations of the positive and beneficial bond between the Children and their pre-adoptive foster family:

> Both [C]hildren are currently thriving in that placement. [M.L.G.], he's developmentally on target. His vocabulary is just – yeah, he is a joy to be around. He is potty training. He is extremely comfortable.
>
> One of my last visits there, he loves to show off that he can have the dogs sit for him, so he runs over to the counter, he will get the dog treats and run over and put his little hands up, and the dogs will sit and get so excited to show these things off. It's great to see.
>
> [R.R.] is thriving in that home too. She's incredibly comfortable there. It is the most comfortable I have seen her. She's very excited. When I went and saw her last over her birthday, we sat and went over all different kinds of birthday gifts she got. She expressed how happy she was to have a tie[-]dyed birthday. She's engaged in gymnastics and will talk to you at length about her network of friends that she has at school and in gymnastics.

N.T., 11/29/23, at 41. Although Ms. Miller observed R.R. and Mother to have a bond, she observed no bond between M.L.G. and Mother. *See id.* at 38. She further opined that any bond between R.R. and Mother was not "necessary and beneficial." *Id.*

The orphans' court explained its rationale for concluding termination was in the Children's best interests:

> The court considered the nature of the bond between Mother and the [C]hildren, their respective safety needs as well as their relationship with the foster parents. [Ms. Miller] reported that R.R. and Mother do share a bond. N.T., 11/29/23, at 38. However, it was her opinion that the bond was not necessary or beneficial. *Id.* R.R. spent a number of years in her Mother's care prior to removal and has struggled with the idea of being adopted. Mother's contact with R.R. has been sporadic over the last year. In R.R.'s most recent conversations with the caseworker and her attorney, she agreed to be adopted. Based upon these factors, the court found that R.R.'s bond with [M]other was not necessary and beneficial. The court is confident that the foster parents would be able to provide R.R. with the support and therapeutic services necessary to overcome any detriment caused by the cessation of the relationship with Mother. M.[L.]G. has been in foster care since he was ten days old. He has never lived with [M]other or had any unsupervised visits with her. It was reported that M.[L.]G. would often cry during visits and that Mother focused more on R.R. during these interactions. Based upon the testimony of [Ms. Miller] and the child's lack of familiarity with Mother, the court found that there was no bond between Mother and M.[L.]G.[]
>
> …. Mother has been unable to provide a safe and stable environment for [the Children] and has continued to abuse drugs. Each time a caseworker has appeared at Mother's home, there have been several adults inside the home who appeared to be under the influence of drugs. Mother has continued to prioritize her drug use over [the Children]. The [C]hildren are in a stable and safe home and all of their needs are being met by the foster parents. OCYF has reported that they are thriving in the care of the [foster family] and comfortable in their foster home. *Id.* at

- 16 -

41. Mother has not been involved in the educational, medical or therapeutic appointments for the [C]hildren. The [C]hildren's caregivers were given secondary and then primary educational and medical decision-making rights because Mother was unable to fulfill those obligations. *Id.* at 29. The [C]hildren have been in several different placements through no fault of their own. They are currently in a pre-adoptive home and have experienced an extended period of stability. Based upon these factors, the court found that termination would best suit the needs and welfare of both [C]hildren.

Orphans' Court Opinion, 11/29/23, at 11-12 (record citations modified).

We agree with the reasoning and conclusion of the orphans' court, as it is supported by the record and free of legal error. *S.P.*, 74 A.3d 817, 826-27. The orphans' court acted within its discretion when it credited Ms. Miller's testimony. *Id.*; *see also L.C.J.W.*, 311 A.3d at 48 ("It is the province of the orphans' court to assess credibility and resolve any conflicts in the evidence, and in doing so it is free to believe all, part, or none of the evidence presented." (citation and quotation marks omitted)). Accordingly, Mother is entitled no relief, and we affirm the orders terminating Mother's parental rights.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 7/22/2024